Petition for review denied; cross-application for enforcement granted by published opinion. Chief Judge TRAXLER wrote the majority opinion, in which Judge DUNCAN joined. Judge AGEE wrote a separate opinion concurring in part and dissenting in part.
OPINION
TRAXLER, Chief Judge:
Aton H. Piester, LLC (“the Company”) petitions this court for review of a decision of the National Labor Relations Board (“the Board”) finding that the Company violated § 8(a)(1) of the National Labor Relations Act (“the Act”), see 29 U.S.CA. § 158(a)(1) (West 1998). The Board cross-applies for enforcement of its order. For the reasons stated below, we deny the Company’s petition for review and grant the Board’s cross-application for enforcement.
I.
Section 7 of the National Labor Relations Act (“the Act”) guarantees employees not only the “right to self-organization, to form, join, or assist labor organizations, [and] to bargain collectively,” but also the right “to engage in other concerted activities for the purpose of ... mutual aid or protection.” 29 U.S.C.A. § 157 (West 1998). Section 8(a)(1) implements these guarantees by making it an unfair labor practice for an employer to “interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157.” 29 U.S.CA. § 158(a)(1).
The complaint in this case alleged that the Company violated § 8(a)(1) on January 13, 2007, by impliedly threatening to discharge its employees if they continued to engage in protected, concerted activity, and on April 2, 2007, by impliedly threatening to discharge — and then actually discharging — employee Darrell Chapman for engaging in protected, concerted activity. An administrative law judge dismissed the allegations, and the General Counsel filed exceptions to each of the dismissals.
*334 The Board, acting through a two-member quorum,[1] found the following facts:
[The Company] is a trucking company. On January, 13, 2007, the [Company’s] owner, Alton Piester, announced a proposed change to its billing and bookkeeping practices regarding fuel surcharges (“the fuel surcharge change”). The change would decrease the drivers’ net pay. Though many drivers protested, Piester told them that his mind was made up and that the change would proceed regardless of their objections. Piester told the objecting drivers that if they didn’t like it, they could “clean out their truck and move to another job.”
“Clean out your truck” has a special meaning for the [Company] and its drivers. A driver will typically leave personal items in a truck if he expects to use it again. Therefore, a supervisor’s statement to a driver to “clean out your truck,” conveys the message that the driver will no longer be operating that truck, i.e., that he is discharged.
After the January 13 meeting, and up to the time of Chapman’s discharge, employees frequently complained among themselves about the fuel surcharge change. Employees also complained directly to Piester and the [Company’s] secretaries, although only Chapman continued to complain to the [Company] after January. On several occasions, however, owner-operator Adger McAlister informed Piester that the drivers continued to complain among themselves about the unfairness of the fuel surcharge change.
On April 2, Chapman spoke with Derrick, the [Company’s] secretary, who also had various accounting duties. Chapman repeated the complaint he (and others) had voiced about the fuel surcharge change, and asked that the surcharge change be reflected on his paycheck stub. During this conversation, Chapman spoke loudly, then went into Piester’s adjoining office to further discuss his concerns. Derrick followed Chapman into the office.
Chapman reiterated to Piester the same complaint and request he made to Derrick, at which point Derrick interjected that if Chapman was unhappy working there, he “should clean out” his truck. Chapman protested that Derrick did not have authority to discharge him. Chapman became louder, got up from his chair, and stepped toward Derrick. Piester then told [Chapman] to clean out his truck, which, as Piester acknowledged at the hearing, meant that Chapman was discharged.
Piester testified that Chapman’s shouting on April 2 was the latest in a series of misconduct, and was the “last straw” in deciding to discharge him. However, Piester did not mention any prior misconduct to Chapman, and the only reason listed for Chapman’s discharge on the form filed with the South Carolina Employment Security Commission was “Disorderly Conduct in office, 4-02-7.” On that form, Piester directly linked Chapman’s April 2 conduct to the January 13 meeting by stating that “meet 1st part of Jan 07 that fuel surcharge would be taken out due to customer didn’t want share.”
J.A. 234-35 (footnotes omitted).
Regarding Piester’s January 13 statement that the drivers could clean out their trucks if they did not like the surcharge *335 change, the Board noted that the ALJ had found that the drivers were engaged in protected, concerted activity that day when they protested the change and that the Company had not excepted to this finding. The Board also determined that Piester’s statement constituted an implied threat to discharge the employees for their protected, concerted activity, and, that even if it meant only that the drivers were free to leave if they did not like the new system, it was still unlawfully coercive.
As for Derrick’s April 2 suggestion to Chapman that he should clean out his truck if he was unhappy, the Board noted that the ALJ had found that Derrick was acting as the Company’s agent when she made the statement and that the Company did not except to that finding. The Board found that the remark, like Piester’s similar January 13 statement, constituted an implied threat of discharge. The Board also determined that Derrick’s remark was directed at Chapman’s April 2 protected activity, for reasons that the Board discussed in detail in its analysis of the Company’s discharge of Chapman. The Board found, therefore, that the statement was unlawfully coercive.
Regarding the discharge itself, the Board found that “Chapman’s conduct on April 2[ ] amounted to a continuation of the earlier concerted employee complaints about the adverse change to the fuel surcharge.” J.A. 237. The Board cited testimony from secretary Sherry Marntin, Piester, and Derrick in support of its finding and found that Piester, from his conversations with owner-operator McAllister, knew that the employees continued to oppose the surcharge change. The Board was not swayed by the fact that Chapman was the only driver who requested that the surcharge be shown on his pay stub. It noted that other drivers had requested that the surcharge calculation be included on worksheets showing how their pay was calculated and that Chapman’s “unique” request was made in the context of his general reiteration of the shared complaint that the policy was unfair. The Board also found that Piester himself viewed Chapman’s April 2 conduct as an extension of the January 13 concerted activity, as evidenced by the fact that Derrick’s statement was almost identical to Piester’s January 13 response and the fact that Piester linked the January 13 and April 2 events in the explanation he gave for Chapman’s discharge on the South Carolina Employment Security Commission form. The Board further found that Chapman’s protected conduct was a motivating or substantial factor for his discharge and that the Company had not proven that it would have discharged Chapman absent the protected, concerted activity.
Finally, the Board found that Chapman did not forfeit the Act’s protection by speaking loudly to Derrick and taking a step in her direction. Applying the test set out in Atlantic Steel Co., 245 N.L.R.B. 814, 816 (1979), the Board found that all four factors favored a conclusion that Chapman did not lose the protection of the Act: The incident took place in an office where no unit employee witnessed it, the subject of the discussion related to protected activity, the nature of the outburst was relatively mild and brief, and the outburst was provoked by Derrick’s unlawful statement. The Board thus concluded that the Company’s discharge of Chapman constituted a § 8(a)(1) violation. On that basis, the Board ordered the Company to offer Chapman full reinstatement or the substantial equivalent, as well as backpay.
II.
The Company first argues that the Board erred in finding that Piester’s statement at the January 13 meeting constitut *336 ed a § 8(a)(1) violation. Although the Company does not dispute that its employees were engaged in protected, concerted action at the meeting by protesting the surcharge change, it contends that Piester’s statement was merely intended to convey that he had made up his mind regarding the surcharge change and that any further complaints by the drivers would be fruitless.[2] The Company further argues that was the meaning Piester intended and that no evidence showed that anyone at the meeting interpreted it otherwise.
Section 10(e) of the Act states that “[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.” 29 U.S.C.A. § 160(e) (West 1998). “Substantial evidence” is “such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” NLRB v. Gen. Wood Preserving Co., 905 F.2d 803, 810 (4th Cir.1990) (internal quotation marks omitted).
When an employer’s actions affect conduct protected by § 7, the actions violate § 8(a)(1) if, “under all the circumstances, the employer’s conduct may reasonably tend to coerce or intimidate employees.” Medeco Sec. Locks, Inc. v. NLRB, 142 F.3d 733, 745 (4th Cir.1998) (internal quotation marks omitted). Under this objective test, “[i]t does not matter whether the particular conduct by the employer was actually coercive,” NLRB v. Transpersonnel, Inc., 349 F.3d 175, 180 (4th Cir.2003), or whether the employer actually intended to coerce, see Medeco Sec. Locks, 142 F.3d at 747. Rather, the salient inquiry is whether the “conduct may reasonably tend to coerce or intimidate employees.” NLRB v. Grand Canyon Mining Co., 116 F.3d 1039, 1044 (4th Cir.1997). Determinations concerning tendency to coerce are “essentially for the specialized experience of the” Board. Id. (internal quotation marks omitted). We therefore grant “considerable deference” to the Board’s decisions on such matters. Medeco Sec. Locks, 142 F.3d at 745.
The Board has often found employers’ statements to be unlawfully coercive when they have invited employees to quit their jobs in response to employees’ § 7 conduct. See, e.g., House Calls, Inc., 304 N.L.R.B. 311, 313 (1991) (finding violation when employer told employees who protested their late paychecks that they could quit if they did not like it). Such statements have been determined to be coercive because they tend to imply that continuing to engage in protected activity is incompatible with continued employment and would be looked upon with disfavor by the employer. See Conley v. NLRB, 520 F.3d 629, 638-39 (6th Cir.2008) (per curiam); Rogers Elec., Inc., 346 N.L.R.B. 508, 515 (2006). We see no reason not to defer to the Board’s similar conclusion here. As we have explained, the test to be applied by the Board was an objective one. Thus, neither Piester’s intentions nor the reactions of those who heard his statement are dispositive.
The Company argues that the Board’s decision amounts to a bright-line rule that an employer acts illegally any time he suggests that his employees can quit if they do not like an objected-to decision. The Board did not purport to base its *337 decision on such a broad rule, however. It simply determined that on the facts before it, where the statement was made in response to the drivers’ concerted protest of the Company’s new policy, the statement had the potential to coerce employees. We conclude that substantial evidence supports the Board’s decision.
III.
The Company next challenges the Board’s finding that Piester’s discharge of Chapman constituted a § 8(a)(1) violation. Specifically, the Company contends that no substantial evidence supported the determination that Chapman was engaged in protected, concerted activity on April 2. We disagree.
Whether particular conduct constitutes “concerted activity],” as that term is used in § 7 is a question for the Board’s specialized expertise, and we review the Board’s determination only for reasonableness. See NLRB v. City Disposal Sys., Inc., 465 U.S. 822, 829-30 & n. 7, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984). “The term ‘concerted aetivit[y]’ is not defined in the Act but it clearly enough embraces the activities of employees who have joined together in order to achieve common goals.” Id. at 830, 104 S.Ct. 1505. To be engaged in concerted activity, employees need not “combine with one another in any particular way.” Id. at 835, 104 S.Ct. 1505. If “a single employee, acting alone, participates in an integral aspect of a collective process,” the conduct may be found to be concerted. Id. In this regard, a conversation involving only a speaker and a listener may constitute concerted activity. Krispy Kreme Doughnut Corp. v. NLRB, 635 F.2d 304, 307 (4th Cir.1980). To do so, however, “it must appear at the very least that [the conversation] was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees.’ ” Id. (quoting Mushroom Transp. Co. v. NLRB, 330 F.2d 683, 685 (3d Cir.1964)). Courts have held that “[t]he lone act of a single employee is concerted if it ‘stems from’ or ‘logically grew’ out of prior concerted activity.” NLRB v. Mike Yurosek & Son, Inc., 53 F.3d 261, 265 (9th Cir.1995) (quoting Ewing v. NLRB, 861 F.2d 353, 361 (2d Cir.1988)). And even if the speaker was never selected as a spokesperson, individual protests of a management decision may properly be characterized as concerted action so long as those disagreeing with the decision “considered that they had a grievance and decided, among themselves, that they would take it up with management.” Guernsey-Muskingum Elec. Coop. Inc., 285 F.2d 8, 12 (6th Cir.1960); see Hugh H. Wilson Corp. v. NLRB, 414 F.2d 1345, 1355 (3d Cir.1969).
As we have explained, the Company does not challenge the fact that Chapman and other drivers engaged in protected, concerted activity by collectively taking up their grievance with management at the January 13 meeting. The Company takes issue, however, with the Board’s finding that Chapman’s April 2 conduct amounted to a continuation of the drivers’ January 13 complaints.[3]
In challenging this determination, the Company first attacks the Board’s under *338 lying factual finding that, in addition to asking that the surcharge be shown on his paycheck stub, Chapman “reiterated the shared employee complaint about the fuel surcharge change” in the Company’s office on April 2. J.A. 237. We conclude that the finding is supported by substantial evidence.
The Board cited testimony from Piester, Marntin, and Derrick in finding that Chapman complained about the surcharge that day. See J.A. 126 (Piester’s testimony that Chapman “mentioned ... the fuel surcharge situation” on April 2); J.A. 166, 167 (Marntin’s testimony that Chapman “was complaining about the fuel surcharge” when he came into her office on April 2 and that he went into Piester’s office and “started discussing the fuel surcharge”); J.A. 180 (Derrick’s testimony that when Chapman came in on April 2, “he was complaining about the fuel surcharge and wanted it show[n] on his check stub”). The Company contends, however, that the testimony, viewed as a whole and in conjunction with Chapman’s testimony, makes clear that “Chapman was not complaining on April 2 about the surcharge” but was “instead asking how his deduction was calculated and asking that the surcharge ‘deduction’ show up on his paycheck.” Brief of Appellant, at 20-21. We disagree.
Marntin and Chapman both testified that Chapman had complained to the secretaries on multiple occasions about the surcharge change between January 13 and April 2. Marntin testified that she believed Chapman was substantially mistaken concerning the amounts being taken out of his paychecks as a result of the change:
[Chapman], along with a couple of other drivers, had c[o]me in and complained to me about the fuel surcharge. I had recalculated the worksheet as though there was no fuel surcharge and told [Chapman] he was losing anywhere from twelve ... to fifteen dollars ... per load alone. I never understood ... why he was thinking he lost between two ... and three hundred dollars ... until I reexamined the worksheets [and] realized he was counting a hundred percent of what the truck makes and the driver can’t do that.
J.A. 165. Marntin testified that although she had repeatedly tried to explain to Chapman that the surcharge was not costing him nearly as much as he thought, he still “believed that [his] check was down several hundred dollars” when he entered the Company office on April 2. J.A. 178.
Marntin testified that when Chapman came in, he “was complaining about the fuel surcharge. He had told [Derrick] that he was wanting it to show on his check stub.” J.A. 166. Derrick also testified that when Chapman came in that day, “he was complaining about the fuel surcharge and wanted it show[n] on his check stub.” J.A. 180.
Chapman’s account of the complaints he made when he came in to the office on April 2 appears largely consistent with Marntin’s and Derrick’s testimony. He testified,
[Marntin] was in the office ... doing the payroll. I started talking to her about it. And I asked her if she’d pull my record up showing me how things were being paid. And ... I said [Marntin], there’s no way that that’ll work. And she said, “What do you mean?”, and I said, “I can’t figure it out. From what you told me, this is what’s happening, I can figure it up it’s not working”. So, ... [Marntin] called [Derrick]. And so I walked over to [Derrick], and ... I said, “[Derrick], just tell me how you all are doing our payroll, how you’re doing the surcharge on our checks”. And she said, “... this is how we do it”. I said, *339 “But that don’t amount up to what you all is telling us that would be coming out of our checks, it don’t amount up”. She said, “What do you mean?” I said, “I figured it up and every time I’m figuring, I’m not coming up with that”. She said, “Well, [Chapman], that’s how we do it”.
J.A. 94-95. Chapman testified that at that point, he went into Piester’s office and told Piester: “I cannot keep making it like this right here.... My check is way less than what it used to be.... This fuel surcharge is killing us ....; there’s no way I can make it like that.” J.A. 95 (internal quotation marks omitted). Chapman testified that in response, Piester “got a pencil and paper out and he started doing some figuring,” J.A. 96, after which Derrick walked in and told Piester that Chapman had requested that his surcharge be shown on his paycheck stub.
Piester’s testimony regarding the substance of his April 2 conversation with Chapman was largely consistent with Chapman’s account. He testified that on April 2, “Chapman mentioned ... the fuel surcharge situation and I didn’t have any problems with that. And I tried to explain the thing to him again.” J.A. 126.
From all of this testimony, several facts are clear. First, since the January 13 meeting, Chapman had repeatedly complained, including on April 2, about what he believed to be the substantial effect that the surcharge was having on his income. Second, in the context of that protest, Chapman had been engaging in an ongoing debate with the Company concerning exactly how much was being taken from his paycheck as a result of the surcharge change. And third, as this debate continued on April 2, Chapman claimed that the Company’s figures did not add up.
What is unclear is whether Chapman was asserting that the Company was taking more than Piester said on January 13 would be taken or whether he was asserting that the Company was taking more than Piester and his secretaries claimed to be taking during the ongoing debate that continued after January 13. If Chapman was making the former assertion, then it would appear that he was raising a complaint distinct from — albeit related to — the complaint raised by the drivers at the January 13 meeting. But, if he was merely rejecting the Company’s claim that the change did not have as large a financial impact as he believed, then it would appear that his primary objection was the one that he and the other drivers had expressed on January 13, namely, that the surcharge change was unfair and too costly to the drivers.
In our view, none of the testimony clearly resolves this question. The best testimony for the Company would seem to be Derrick’s answer to the question of whether Chapman felt the Company was “taking out more than [it] should have” from his check. J.A. 189. Derrick responded, ‘Yes. Yes, I believe he thought we were taking out more — he was coming up with a different figure somehow.” J.A. 189-90. This answer is less than clear, however, and Piester’s description of Chapman’s complaints — “he mentioned ... the fuel surcharge situation, and I didn’t have any problems with that,” J.A. 126 — seems more consistent with the notion that Chapman had repeated the familiar shared general complaint about the surcharge.[4] Derrick’s response that Chapman should clean out his truck if he was unhappy working for the Company also seems a more likely response to a reiteration of the January 13 *340 complaint than to the complaints the Company claims Chapman was making. In the end, we conclude that this is simply a very close factual issue, and, regardless of how we would have resolved it in the first instance, substantial evidence supports the Board’s finding that Chapman was reiterating the shared employee complaint.
Relying on Manimark Corp. v. NLRB, 7 F.3d 547 (6th Cir.1993), the Company next argues that even if Chapman did repeat his opposition to the surcharge change in the Company’s offices on April 2, his actions were not protected because he was acting only on his own behalf, not on behalf of other drivers. In Manimark, the court determined that an employee’s action was not “concerted” within the meaning of § 7, even though the employee had raised concerns to his employer that were shared by other employees. See Manimark, 7 F.3d at 550-51. We do not find Mani-mark to have much bearing on the result here, however. Critical to the Manimark court’s decision was the fact that the conversation between the employee and employer took place because the employer had summoned the employee to discuss a separate matter that affected only the employee. See id. at 550. After disagreeing with the employer concerning that matter, the employee brought up the unrelated complaint at issue only “as an afterthought.” Id. Also important in Mani-mark was the fact that while the complaint at issue was one shared by other employees, there was “nothing to indicate that [the employees] had decided to act upon those” complaints. Id. at 551.
In contrast to Manimark, here it is undisputed that the drivers acted in concert in jointly protesting the surcharge change at the January 13 meeting. The narrow question for the Board, therefore, was whether Chapman’s April 2 conduct was a continuation of that action. We conclude that the Board was on firm ground in finding that it was. The Board found as a fact that after the drivers jointly presented their complaints on January 13, the controversy had continued unabated prior to April 2 as the drivers continued to repeatedly discuss the surcharge among themselves and Chapman continued to complain to the secretaries and to Piester. Moreover, the Board found that Piester knew that the other drivers continued to complain about the change amongst themselves. Cf. City Disposal Sys., Inc., 465 U.S. at 832, 104 S.Ct. 1505 (holding that a “lone employee’s invocation of a right grounded in his collective-bargaining agreement is ... a concerted activity in a very real sense” because the employee is in effect reminding his employer of the power of the group that brought about the agreement and that could be reharnessed if the employer refuses to respect the employee’s objection). In fact, evidence in the record suggested that Piester himself understood Chapman’s April 2 complaints to be an extension of the January 13 concerted activity. A South Carolina Employment Security Commission form signed by Piester listed the reason for Chapman’s termination as “meet 1st part of Jan 07 that fuel surcharge would be taken out due to customer didn’t want share. Disorderly conduct in office, 4-2-07.” J.A. 216. For all of these reasons, we believe that, even though Chapman’s continued protests were presented individually, they were reasonably understood by the Board to be a continuation of the drivers’ mutual decision “to take [their grievance] up with management.” Guernsey-Muskingum Elec. Coop., Inc., 285 F.2d at 12; see Hugh H. Wilson Corp., 414 F.2d at 1355.
We note that our conclusion is strongly supported by Dayton Typographic Service, Inc. v. NLRB, 778 F.2d 1188 (6th Cir.1985), which reached a similar result on closely analogous facts. In that case, *341 an employee and several of his coworkers complained to their supervisor at a meeting about several working conditions, including the fact that they were often required to work overtime on Saturdays for no pay. See id. at 1189. When the complaint went unaddressed, the employee reiterated his concerns regarding unpaid Saturday work on two more occasions, one about a month after the original complaint, and one about a month after that. See id. Subsequently, he and another employee argued heatedly when their supervisor told them that one of them would have to work the next Saturday. See id. at 1189-90. The employee continued to argue that employees should be paid for their Saturday work. See id. at 1190. The court found reasonable a Board finding that the subsequent complaints constituted a continuation of the initial joint complaints. See id. at 1191-92. The court found non-dispositive the fact that the employee had not been chosen by his fellow employees as a spokesman for their joint complaints and noted that although the company claimed the other employees had lost interest in the issue, the company did not present any evidence of that fact. See id. at 1192. Rather, the court concluded that it was sufficient to warrant protection that the employees had decided amongst themselves to bring their collective concern to management. See id. at 1191-92.
The Company emphasizes that Chapman’s request to have the surcharge shown on his pay stub was a request that no other driver had made and that his protests were always framed in terms of how much money he personally was losing. However, we conclude that it was reasonable for the Board to find these facts not dispositive. In the weeks after the January 13 meeting, the group opposition to the surcharge change had spawned a number of requests that the surcharge be shown in worksheets explaining how the drivers’ wages were calculated. Chapman’s request to have the surcharge shown on his pay stub was only a slight variation on those requests, and it was presented “in the context of [Chapman’s] underlying complaints about the fuel surcharge change.” J.A. 238. As for the fact that Chapman stated his objections in terms of the effect that it was having on his paycheck, that would at most show only that it was his concern for his own finances rather than those of the group that motivated his support for the drivers’ collective position. See Joanna Cotton Mills Co. v. NLRB, 176 F.2d 749, 753 (4th Cir.1949) (explaining that individual’s personal motivation for attempting to further group action does not prevent the conduct from being protected). There was no testimony that Chapman sought a personal exemption from the surcharge change that would not have applied to the other drivers as well. We therefore conclude that the Board’s decision that Chapman was engaged in protected, concerted activity on April 2 was a reasonable one.
IV.
For the foregoing reasons, we deny the Company’s petition for review of the Board’s order and grant the Board’s cross-application for enforcement.

PETITION FOR REVIEW DENIED; CROSS-APPLICATION FOR ENFORCEMENT GRANTED

. We have held that the Board can delegate its authority to a panel of three members and that two members are authorized to do that panel’s work with a two-member quorum. See 29 U.S.C.A. § 153(b) (West 1998); Narricot Indus., v. NLRB, 587 F.3d 654, 658-60 (4th Cir.2009).

. The Company also maintains that the Board erred in relying on Chapman’s testimony, which the Company contends was perjurious. However, the Board’s order reflects that it in fact did not rely on Chapman’s testimony, and the Company does not explain why it believes otherwise.

. The Company also argues that even if Chapman was engaged in protected conduct, the Board erred in finding that he did not forfeit his protective status for engaging in egregious conduct. General Counsel argues that this issue is not properly preserved for our review. Even assuming that this issue has not been waived, however, we conclude that the Board’s determination that Chapman's conduct did not lose its protected status was clearly supported by substantial evidence in the record.

. And, of course, Chapman's own testimony that he told Piester, "This fuel surcharge is killing us,” J.A. 95, also is more consistent with the latter interpretation.