**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 10-2122**

_____

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

WHITE OAK MANOR,

Respondent.

_____

On Application for Enforcement of an Order of the National Labor
Relations Board. (11-CA-21786)

_____

Argued: September 22, 2011          Decided: October 28, 2011

_____

Before DUNCAN, DAVIS, and DIAZ, Circuit Judges.

_____

Application for enforcement granted by unpublished opinion.
Judge Diaz wrote the opinion, in which Judge Duncan and Judge
Davis joined.

_____

**ARGUED:** Thomas Howard Keim, Jr., FORD & HARRISON, LLP,
Spartanburg, South Carolina, for Respondent. Nicole Lancia,
NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for
Petitioner. **ON BRIEF:** Kristin Starnes Gray, FORD & HARRISON,
LLP, Spartanburg, South Carolina, for Respondent. Lafe E.
Solomon, Acting General Counsel, Celeste J. Mattina, Acting
Deputy General Counsel, John H. Ferguson, Associate General
Counsel, Linda Dreeben, Deputy Associate General Counsel, Usha
Dheenan, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD,
Washington, D.C., for Petitioner.

_____

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Petitioner National Labor Relations Board seeks enforcement of an order that it entered in this case. The Board's order adopted the findings of the administrative law judge ("ALJ"), concluding that respondent violated the National Labor Relations Act ("NLRA") by terminating an employee for engaging in protected concerted activity. Respondent contests petitioner's application for enforcement, challenging the Board's ruling. Because substantial evidence supports the ALJ's findings as adopted by the Board, we grant petitioner's application for enforcement.

I.

A.

Respondent White Oak Manor ("White Oak") operates a long-term care facility in Shelby, North Carolina. Nichole Wright-Gore worked as a central supply clerk at White Oak until her termination on November 16, 2007.

After receiving a "terrible haircut" and unable to "do anything with [her] hair," Wright-Gore wore a hat to work on October 23, 2007. J.A. 66. She continued donning the hat while at work for the next week, and no supervisors commented on her dress. That changed on October 30, when Peggy Panther, White Oak's personnel director, explained to Wright-Gore that wearing

a hat violated the company's dress code. Later that day, Tammy Whisnant, White Oak's assistant director of nursing, told Wright-Gore to remove the hat, but she refused. Whisnant reported Wright-Gore's insubordination to Terry Fowler, the director of nursing. Fowler called Wright-Gore to her office, where Whisnant and Panther were waiting. Fowler told Wright-Gore that White Oak's dress code forbade employees to wear hats and that Wright-Gore should go home if she refused to remove her hat. Wright-Gore protested that other employees were allowed to wear hats and singling her out was unfair. She declined to remove her hat and left the facility for the day.

Wright-Gore returned to White Oak for work the next day, when she and other employees wore costumes in celebration of Halloween. She dressed as a race-car fan, and her costume included a hat. Andy Nelson, the administrator of White Oak, suggested that Wright-Gore remove the hat, and she complied. Still concerned about Wright-Gore's refusal to follow Fowler's orders the day before, Nelson met with both employees later that day. Wright-Gore explained to Nelson that she felt that White Oak was enforcing the dress code unevenly, but Nelson told her to worry only about herself. As the meeting concluded, Nelson handed Wright-Gore a written warning for insubordination.

In the days following her meeting with Nelson, Wright-Gore paid particular attention to the clothing worn by fellow

4

employees. She noticed that several of her coworkers were wearing hats and displaying their tattoos, in violation of White Oak's dress code. Management, however, failed to address these obvious transgressions. Upset at the disparate enforcement of the dress code, Wright-Gore began talking to female employees to enlist their support. From around November 5 until November 12, she spoke with roughly ten employees about the inequitable implementation of the dress code. Wright-Gore's coworkers shared their own experiences with unequal enforcement of the policy and expressed support for her grievance.

To bolster her complaint, Wright-Gore decided to document dress-code violations. On November 12 and 13, she used her cell phone to take pictures of employees dressed contrary to company policy. Wright-Gore took pictures of four employees--Larry Shea Roberts, David Layell, Harold Hopper, and Deborah Mitchell. Although Roberts and Mitchell gave Wright-Gore permission to photograph them, Hopper and Layell were unaware of Wright-Gore's actions. Wright-Gore enlisted the help of coworker Angela Hawkins when she took a picture of Roberts.

Wright-Gore shared her pictures with several White Oak employees. While showing the photographs to coworkers, Wright-Gore explained that she had documented disparate enforcement of the dress code. The employees generally expressed agreement with Wright-Gore's grievance. Again, Hawkins assisted Wright-

5

Gore, sharing a picture with coworker Crystal Henson and declaring "look what we got." Id. 289.

On November 15, Kathy Gunter, White Oak's business office manager, informed Nelson that Wright-Gore had been showing coworkers pictures of employees violating the dress code. That same day, Roberts complained that Wright-Gore had taken his picture without permission. Nelson convened a meeting that afternoon with Wright-Gore and Whisnant, where he confronted Wright-Gore about the photographs. Wright-Gore explained to Nelson that she had a problem with what she perceived as uneven enforcement of the dress code. She told Nelson, when asked, that she had received permission to take the pictures. Nelson called her a liar. In response to Wright-Gore's broader grievance, Nelson wondered aloud whether she was "going to let a hat come in between the food on [her] kids' table." Id. 114.

Following the meeting, Nelson initiated an investigation. He was particularly concerned that Wright-Gore had violated White Oak's policy proscribing the taking of pictures inside the facility without prior written authorization. He approached employee T.C. Brooks, whom Gunter claimed Wright-Gore had photographed. Brooks was unaware that Wright-Gore had taken a picture of him, but he agreed to fill out a complaint form. Nelson spoke with other employees, ultimately deciding to discharge Wright-Gore.

6

The next day, November 16, Nelson called Wright-Gore to his office and informed her that her employment had been terminated. Nelson explained that his investigation had confirmed that she had taken pictures of employees without their permission. According to the termination report prepared by Nelson, Wright-Gore had violated White Oak's policy barring "[s]tealing or misappropriating (misusing) property belonging to the facility, residents, or other employees." Id. 515. Elaborating on the charge, Nelson wrote that Wright-Gore "took a picture of another employee without his/her permission and in turn, showed it to other employees." Id. Nelson explained that he was discharging Wright-Gore for taking a picture of Brooks.

White Oak had not established a precedent for disciplining employees for photographing fellow employees absent their permission. Indeed, Wright-Gore's termination was the first time that White Oak had enforced the policy. Employees routinely took pictures of each other--at facility events or while "goofing off" at work--and never asked for or received permission. The staff freely shared these pictures, posting them on facility bulletin boards or passing them around the office.

Testifying at the administrative hearing, Wright-Gore reflected on her efforts to document disparate enforcement of the dress code. She explained that she spoke with other

7

employees "[t]o get their support so I could go to management and say, you know, there's [sic] other people that are agreeing with me that, you know, the dress code is not being enforced fairly." Id. 131. Wright-Gore denied that she had taken action solely for her own benefit, maintaining instead that she took pictures to demonstrate to supervisors "that their dress code wasn't being enforced fairly for the entire facility." Id. 170. At bottom, she "wanted the dress code to be enforced equally and fairly with everyone." Id. 161.

B.

Wright-Gore responded to her termination by submitting a charge to the Board, in which she claimed that White Oak had violated the NLRA. The Board's General Counsel, in turn, filed a complaint with the Board, alleging that White Oak violated section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), by interrogating, threatening, and discharging Wright-Gore as a result of her protected concerted activity. White Oak contested the allegations, and the parties proceeded to an administrative hearing.

The ALJ concluded that White Oak had violated section 8(a)(1) of the NLRA by discharging Wright-Gore for her protected concerted activity. Viewing the evidence globally, the ALJ found that "what had initially started as an individual

8

complaint by [Wright-Gore], that she was being treated unfairly by being required to remove her hat, evolved into a campaign by [Wright-Gore] to have the dress code enforced in a fair and equitable manner." J.A. 634. According to the ALJ, Wright-Gore engaged in protected concerted activity by speaking with other employees about disparate enforcement of the dress code and documenting the problem through photography:

> It is clear that [Wright-Gore] was addressing the perceived unfair enforcement of the dress code and was seeking to obtain the support of the female employees to come together and make their positions known to Respondent's management and particularly Nelson, that these employees wanted the Respondent to remedy the unfair enforcement of the dress code. This constituted a joining together of the employees for their mutual aid and protection as the wearing of hats and other items outlined in the dress code would affect terms and conditions of employment.

Id. 636.

The ALJ reasoned that Hawkins's assistance and Wright-Gore's conversations with other employees satisfied the NLRA's requirement that an employee be engaged in concerted activity. The concerted activity was also protected under the NLRA, stated the ALJ, because Wright-Gore "was engaged in a joint discussion of the unfairness of the dress code, and . . . it was implicit, therein, that she was seeking a change in the enforcement of the dress code." Id. Because Wright-Gore's picture taking was protected concerted activity and White Oak discharged her for

9

that activity, the ALJ determined that White Oak had violated the NLRA.

Wright-Gore did not lose protection of the NLRA by violating a White Oak rule prohibiting the taking of pictures of other employees without permission, concluded the ALJ. He found that employees freely took pictures of each other, without first receiving permission, and often displayed these pictures throughout the facility. Thus Wright-Gore's purported violation of White Oak policy was not so egregious as to strip her of the NLRA's safeguards.

The ALJ declined to carry out a dual-motive analysis under Wright Line, 251 N.L.R.B. 1083 (1980). Because the reason for termination was not at issue--all agreed that White Oak had discharged Wright-Gore for photographing an employee without permission--the ALJ concluded that Wright Line was inapposite.

The ALJ ordered White Oak to comply with the NLRA's provisions, post appropriate notice, offer Wright-Gore immediate reinstatement, and give her back pay with interest.

The Board affirmed the ALJ's findings and adopted his recommended order.[1] The Board resisted White Oak's challenges to

---

[1] The Board initially affirmed the ALJ in a January 30, 2009 decision. White Oak responded by filing a petition for review in the U.S. Court of Appeals for the D.C. Circuit. Before the D.C. Circuit ruled on the petition, the Supreme Court issued its decision in New Process Steel, L.P. v. NLRB, 130 S. Ct. 2635 (Continued)

10

the ALJ's credibility determinations, discerning no basis for upsetting these findings.  It also endorsed the ALJ's conclusion that Wright-Gore's picture taking was not sufficiently egregious to remove her from the NLRA's protection.  It found that White Oak did not enforce its rule prohibiting photographing absent permission, as employees routinely took and posted photographs of each other.  Moreover, the Board noted that the ALJ determined that White Oak's basis for terminating Wright-Gore's employment--that she photographed Brooks without his permission--was groundless, because Wright-Gore never took a picture of Brooks.

The General Counsel's application for enforcement of the Board's order is now before us.


II.

The thrust of White Oak's argument against enforcement is that Wright-Gore's motives sounded purely in self interest, precluding a finding that she engaged in protected concerted

---

(2010), which invalidated the Board's two-member decisions.  Id. at 2644.  Because only two Board members had participated in the 2009 decision, the D.C. Circuit vacated the decision and remanded the case for further proceedings.  White Oak Manor v. NLRB, Nos. 09-1068, 09-1098, 2010 WL 4227419, at *1 (D.C. Cir. Sept. 20, 2010).  A three-member panel of the Board then decided the case on September 30, 2010, reaffirming its 2009 conclusions.  White Oak Manor, 355 N.L.R.B. No. 211 (Sept. 30, 2010).

activity.  According to White Oak, the record establishes that Wright-Gore complained about the dress code and documented its uneven enforcement for her sole benefit, never intending to act on behalf of a broader group of employees.  Because the evidence does not support a determination that Wright-Gore engaged in protected concerted activity, White Oak insists that her discharge did not violate the NLRA.

We disagree.  Layers of deference inhering in the review of Board decisions counsel hesitation before disturbing the ALJ's factual determinations.  Substantial evidence in the record before us supports the ALJ's findings that Wright-Gore joined with other employees to challenge White Oak's uneven enforcement of its dress code.  Accordingly, White Oak violated the NLRA by discharging Wright-Gore for engaging in this protected concerted activity.

A.

Contrary to White Oak's suggestion at oral argument, our review of Board decisions is carefully circumscribed.  "[W]e are obliged to uphold the Board's legal interpretations if they are 'rational and consistent' with the [NLRA]."  Anheuser-Busch, Inc. v. NLRB, 338 F.3d 267, 273 (4th Cir. 2003) (quoting Sam's Club v. NLRB, 173 F.3d 233, 239 (4th Cir. 1999)).  The substantial-evidence standard governs our review of the factual

12

findings made by the ALJ and affirmed by the Board.  Id. at 273–74.  If findings of fact are supported by substantial evidence, looking to the record as a whole, "we must uphold the Board's decision 'even though we might have reached a different result had we heard the evidence in the first instance.' " Medeco Sec. Locks, Inc. v. NLRB, 142 F.3d 733, 742 (4th Cir. 1998) (quoting Alpo Petfoods, Inc. v. NLRB, 126 F.3d 246, 250 (4th Cir. 1997)). "Substantial evidence" means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Anheuser-Busch, 338 F.3d at 274 (quoting NLRB v. Peninsula Gen. Hosp. Med. Ctr., 36 F.3d 1262, 1269 (4th Cir. 1994)).

Critically here, the determination of whether an employee was engaged in protected concerted activity is also reviewed under the substantial-evidence standard.  Alton H. Piester, LLC v. NLRB, 591 F.3d 332, 337 (4th Cir. 2010).

B.

The NLRA confers on employees "the right . . . to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157. Section 8(a)(1) of the Act forbids "an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title."  Id. §

13

158(a)(1). Disciplinary measures are the very archetype of coercion under the NLRA, and an employee may not be discharged for engaging in protected concerted activity. See NLRB v. Air Contact Transp. Inc., 403 F.3d 206, 213 (4th Cir. 2005).

By its plain terms, the NLRA protects employees in the exercise of conduct engaged in "for the purpose of . . . mutual aid or protection." 29 U.S.C. § 157. "The 'mutual aid or protection' clause . . . protects employees who 'seek to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship.' " New River Indus., Inc. v. NLRB, 945 F.2d 1290, 1294 (4th Cir. 1991) (quoting Eastex, Inc. v. NLRB, 437 U.S. 556, 565 (1978)). An employer's dress code is one such "condition[] of employment which employees may seek to improve," and such efforts qualify as protected activity under the NLRA. Id.

Not only must the activity be protected, but it must be the product of concerted action. See 29 U.S.C. § 157. We have affirmed that the term "concerted activity," as used in the NLRA, " 'clearly enough embraces the activities of employees who have joined together in order to achieve common goals.' " Piester, 591 F.3d at 337 (quoting NLRB v. City Disposal Sys. Inc., 465 U.S. 822, 830 (1984)). The inquiry is flexible, and "employees need not 'combine with one another in any particular

14

way' " to support a finding of concerted activity.  Id. (quoting City Disposal, 465 U.S. at 835).  Indeed, " 'the lone act of a single employee is concerted if it stems from or logically grew out of prior concerted activity.' "  Id. (quoting NLRB v. Mike Yurosek & Son, Inc., 53 F.3d 261, 265 (9th Cir. 1995)).  Even "a conversation involving only a speaker and a listener may constitute concerted activity," so long as " 'the conversation was engaged in with the object of initiating or inducing or preparing for group action or . . . had some relation to group action in the interest of the employees.' "  Id. (quoting Krispy Kreme Doughnut Corp. v. NLRB, 635 F.2d 304, 307 (4th Cir. 1989)).

To qualify as concerted activity, an employee's actions need not spring from a formalized plan.  For instance, a single employee's conversations with management about a condition of employment may constitute concerted activity even if a broader group of employees never appointed her spokesperson.  Id. "[I]ndividual protests of a management decision may properly be characterized as concerted action so long as those disagreeing with the decision 'considered that they had a grievance and decided, among themselves, that they would take it up with management.' "  Id. (quoting NLRB v. Guernsey-Muskingum Elec. Coop., Inc., 285 F.2d 8, 12 (6th Cir. 1960)).

15

That an employee's self-interest catalyzed her decision to complain about working conditions does not inexorably bar a determination that her actions were protected and concerted. Id. at 341 (construing Joanna Cotton Mills Co. v. NLRB, 176 F.2d 749, 753 (4th Cir. 1949), as "explaining that [an] individual's personal motivation for attempting to further group action does not prevent the conduct from being protected"). Motives are often not monolithic, and an employee may seek both to mitigate a problematic policy affecting her and to improve the lot of her coworkers. Though a speaker may articulate a grievance with reference only to herself, such an activity is protected under the NLRA so long as the sought-after remedy would necessarily benefit other employees. Id. ("As for the fact that Chapman stated his objections in terms of the effect that it was having on his paycheck, that would at most show only that it was his concern for his own finances rather than those of the group that motivated his support for the drivers' collective position. There was no testimony that Chapman sought a personal exemption from the surcharge change that would not have applied to the other drivers as well." (citation omitted)).

## C.

With the foregoing principles in mind, we hold that substantial evidence supports the findings of the ALJ that White

Oak discharged Wright-Gore for engaging in protected concerted activity. As a preliminary matter, we note that the termination of Wright-Gore's employment most assuredly qualifies as "coercion" proscribed by section 8(a)(1) of the NLRA, see Air Contact, 403 F.3d at 213, a point neither party contests. Nor do the parties dispute the grounds for Wright-Gore's termination--her taking and distributing a photograph of Brooks. Thus our inquiry is limited to determining whether Wright-Gore's photographing of fellow employees--as part and parcel of her larger grievance over dress-code enforcement--constitutes protected concerted activity under the NLRA. We conclude that it does.

Wright-Gore's complaints about White Oak's disparate enforcement of its dress code are protected under the NLRA. See New River, 945 F.2d at 1294 (holding that dress codes are a "condition[] of employment which employees may seek to improve" while receiving the safeguards of the NLRA). As part of the res gestae of her overarching grievance about dress-code enforcement, Wright-Gore's documenting of the problem through photography is similarly protected conduct. See Media Gen. Operations, Inc. v. NLRB, 394 F.3d 207, 213 (4th Cir. 2005) (endorsing determination that conduct that is part of the res gestae of protected concerted activities benefits from the NLRA's safeguards).

17

Wright-Gore's activities moreover were the product of concerted action. Wright-Gore spoke with roughly ten employees about uneven enforcement of White Oak's dress code. Her coworkers sympathized with her concerns, raising their own independent complaints about dress-code implementation and expressing their hopes for more equitable enforcement. At least one employee, Hawkins, assisted Wright-Gore with her efforts to document the problem, encouraging Roberts to pose for a picture and sharing pictures with Henson. Indeed, Hawkins felt a sense of ownership in the enterprise, remarking to Henson "look what we got" when showing her a photograph. See J.A. 289.

Because Wright-Gore's conversations were initiated to induce group action--she explained that she spoke with other employees "[t]o get their support so I could go to management and say, you know, there's [sic] other people that are agreeing with me that, you know, the dress code is not being enforced fairly," id. 131--they constitute concerted activity. See Piester, 591 F.3d at 337. To be sure, Wright-Gore's fellow employees did not formally appoint her spokesperson regarding complaints over dress-code enforcement, but substantial evidence supports the conclusion that the employees determined that they had a collective grievance and resolved to " 'take it up with management.' " See id. (quoting Guernsey-Muskingum, 285 F.2d at 12).

18

In an effort to resist the analysis outlined above, White Oak maintains that Wright-Gore's interest in benefiting herself ineluctably precludes a finding that she was engaged in protected concerted activity. But White Oak's rigid formulation--that an employee may not be motivated by both self-interest and collective well being--finds support in neither common sense nor precedent. White Oak's position ignores Wright-Gore's consistent assertions that she "wanted the dress code to be enforced equally and fairly with everyone," J.A. 161. Wright-Gore's grievance may have started as an individual gripe about being disciplined for wearing a hat, but substantial evidence supports the ALJ's determination that it "evolved into a campaign . . . to have the dress code enforced in a fair and equitable manner," id. 634.[2]

White Oak's position similarly overlooks our precedent, which does not find mutually exclusive an employee's acting in self-interest and her engaging in protected concerted activity.

---

[2] White Oak repeatedly mentions Wright-Gore's purported "admission" that she was the only employee who wanted to wear a hat. This myopic focus on hat wearing misses the forest for the trees. Wright-Gore may indeed have been the only employee who bristled at the dress code's proscription on hat wearing, but this has no bearing on the overarching complaint about uneven enforcement of the dress code. Wright-Gore's grievance--and that of her coworkers--was not about the terms of the dress code, but rather the disparate enforcement of those terms. That no other employee wished to wear a hat to work does not in the least detract from the force of this broader complaint.

Even if an employee's grievance sounds entirely in self-interest, it still constitutes protected concerted activity so long as the remedy will benefit other employees. Piester, 591 F.3d at 341. Equitable enforcement of a dress code definitionally benefits all. As such, Wright-Gore's conduct was protected concerted activity under the NLRA, even if she was motivated by a sense that White Oak was both treating her unfairly and unevenly enforcing the dress code.[3]

## III.

Even assuming that Wright-Gore engaged in protected concerted activity, White Oak contends that her decision to photograph other employees violated a valid company rule and thereby authorized her termination. Because Wright-Gore took pictures of employees without securing their permission, White Oak maintains that it discharged her consistent with the dictates of the NLRA. We disagree.

---

[3] White Oak attacks the ALJ's credibility determinations in an effort to challenge the Board's conclusions. " '[W]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent exceptional circumstances.' " NLRB v. CWI of Md., Inc., 127 F.3d 319, 326 (4th Cir. 1997) (quoting Fieldcrest Cannon, Inc. v. NLRB, 97 F.3d 65, 69 (4th Cir. 1996)). Cognizant that " '[t]he balancing of witnesses' testimony is at the heart of the fact-finding process,' " WXGI, Inc. v. NLRB, 243 F.3d 833, 842 (4th Cir. 2001) (quoting Fieldcrest Cannon, 97 F.3d at 71), we find no "exceptional circumstances" compelling us to disturb the ALJ's credibility determinations as adopted by the Board.

An employee, though otherwise engaging in protected concerted activity, "can lose the [NLRA's] protections if his 'conduct is so egregious as to take it outside the protection of the Act, or of such a character as to render the employee unfit for further service.' " Anheuser-Busch, 338 F.3d at 280 (quoting Consumers Power Co., 282 N.L.R.B. 130, 132 (1986)); see also Stanford, N.Y., LLC, 344 N.L.R.B. 558, 558 (2005) ("When an employee is discharged for conduct that is part of the res gestae of protected concerted activities, the pertinent question is whether the conduct is sufficiently egregious to remove it from the protection of the [NLRA]."). To be stripped of the safeguards of the NLRA, an employee's conduct must meet a high threshold of egregiousness. E.g., Media Gen. Operations, 394 F.3d at 213 (reaffirming that conduct " 'occurring during the course of otherwise protected activity remain[s] likewise protected unless . . . so violent or of such serious character as to render the employee unfit for further service' " (quoting Sullair P.T.O., Inc. v. NLRB, 641 F.2d 500, 502 (7th Cir. 1981))).

White Oak has failed to make the requisite threshold showing of egregiousness. The company's utter failure to enforce its picture-taking policy militates against a finding that Wright-Gore's conduct removed her from the aegis of the NLRA. Indeed, White Oak had never before disciplined an

21

employee for taking pictures of coworkers without first securing their permission. Quite the opposite, the company had allowed employees to freely take pictures of each other absent permission, and to share the photographs and even post them on facility bulletin boards. White Oak's claim that Wright-Gore's conduct " 'is so egregious' " as to " 'render [her] unfit for further service,' " Anheuser-Busch, 338 F.3d at 280 (quoting Consumers Power, 282 N.L.R.B. at 132), thus rings hollow.

More fundamentally, the act for which Wright-Gore was terminated never even occurred. Nelson stated that the sole reason for Wright-Gore's discharge was her photographing Brooks. The ALJ and the Board concluded that Wright-Gore never took a picture of Brooks. Because White Oak discharged Wright-Gore for conduct in which she never engaged, it can find no refuge in the egregiousness safe harbor.

IV.

Moving beyond the substance of the Board's ruling, White Oak lodges two procedural challenges. First, it argues that the ALJ and Board were obligated to perform a Wright Line motive analysis. Second, White Oak maintains that we must revise the Board's proposed notice to reflect that Wright-Gore has waived reinstatement and settled her claim for back pay. Both contentions are groundless.

22

A.

The Board in <u>Wright Line</u> crafted a test to employ in "dual motive" cases--disputes in which there is "both a 'good' and a 'bad' reason for the employer's action [that] requires further inquiry into the role played by each motive." 251 N.L.R.B. at 1084. We have clarified that invocation of the <u>Wright Line</u> analysis is appropriate only in "situations where the employer's motive is at issue, such as cases where the employee claims that the employer took action against him for engaging in protected activity and the employer claims that it took action against the employee for some other reason." <u>Air Contact</u>, 403 F.3d at 215; <u>see</u> <u>also</u> <u>Allied Aviation Fueling of Dallas, LP</u>, 347 N.L.R.B. 248, 248 n.2 (2006) (concluding that the <u>Wright Line</u> analysis should not be used "where an employer admits that it discharged an employee for engaging in protected activity").

Because White Oak's motive is not in dispute, application of the <u>Wright Line</u> analysis is inappropriate. White Oak and the Board agree that Wright-Gore was terminated for photographing a coworker without his permission, in violation of a company rule. The crux of this appeal is whether that activity, viewed as part of Wright-Gore's grievance about enforcement of the dress code, constitutes protected concerted activity under the NLRA. This is manifestly not a case in which the employer's motive--i.e., its "real" reason for discharging the employee--is at issue, and

23

application of the Wright Line test is not warranted.  See Air Contact, 403 F.3d at 215.

## B.

Finally, without passing on the merits of White Oak's challenge to the Board's proposed notice, we simply conclude that this appeal is not the proper proceeding in which to resolve the dispute.  The Supreme Court has long recognized that a compliance proceeding, taking place after the merits have been finally resolved, is the proper forum in which to adjudicate disagreements over the proposed notice and attendant remedies. Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 898–99 (1984).  White Oak will have ample opportunity to press its arguments about the proper "tailoring [of] the remedy to suit the individual circumstances of [this] discharge" in subsequent compliance proceedings.  See id. at 902.

## V.

Substantial evidence supports the ALJ's conclusion that White Oak discharged Wright-Gore for engaging in protected concerted activity, in violation of the NLRA.  Accordingly, we grant the Board's application for enforcement.

APPLICATION FOR ENFORCEMENT GRANTED

24