**BOSTON MUTUAL LIFE INSURANCE COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 82–1173.

United States Court of Appeals, First Circuit.

Argued Sept. 13, 1982.

Decided Oct. 12, 1982.

Henry T. Goldman, Washington, D.C., with whom Richard J. Walsh, and Warner & Stackpole, Boston, Mass., were on brief, for petitioner.

Helen L. Morgan, Atty., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Paul J. Spielberg, Deputy Asst. Gen. Counsel, Washington, D.C., were on brief, for respondent.

Before DAVIS\*, CAMPBELL and BREYER, Circuit Judges.

BREYER, Circuit Judge.

The Boston Mutual Life Insurance Company, the petitioner here, discharged a debit agent named Francis Thone. Boston Mutual claims it did so because Thone made improper use of its system allowing policyholders' premiums to be paid out of policy dividends and "because of his previous disciplinary record." The National Labor Relations Board claims that Boston Mutual's

\* Of the Federal Circuit, sitting by designation.

actual motive was Thone's union activity. An administrative law judge found that Boston Mutual violated National Labor Relations Act § 8(a)(1), 29 U.S.C. § 158(a)(1), in threatening to discharge Thone, and § 8(a)(3), 29 U.S.C. § 158(a)(3), in discharging him. The Board affirmed the ALJ's finding. We review the Board's decision to determine whether it is supported by substantial evidence. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We conclude that it is.

Boston Mutual maintains thirteen regional or district offices throughout New England. Its headquarters are in Canton, Massachusetts. Thone worked out of the Methuen office, along with debit agents Leland Greenberg, Karen Greenberg, and others. The management employees directly involved in Thone's dismissal included Eugene DiPirro, Regional Sales Manager; John Topjian, DiPirro's immediate superior at the home office; and Roy Daniels, Topjian's immediate supervisor.

Boston Mutual hired Thone in 1970. He worked there until his discharge in May 1980, with two important exceptions. In 1974 Boston Mutual discharged Thone because it found a money shortage in his books; it reinstated him in early 1975 "for humanitarian reasons." It also suspended him for one week in 1977 for insubordination.

Thone became office chairman ("steward") of the Insurance Workers' International Union in 1975. While he was steward he filed about ten grievances; he filed five of these after June 1979, when DiPirro became regional manager, and some, if not all, of these appear to be based upon his own complaints about DiPirro. Thone testified that, as steward, he would also advise employees of their rights under the collective bargaining agreement, and help them to "better understand their job."

The parties agree that Thone abused the Company's "dividend premium payment" policy. That policy allowed an agent to apply the policy's dividends to payment of premiums; it was designed to prevent a policy from lapsing when its holder did not

pay on time, but it was to be used only when necessary to keep the policy from lapsing. Thone, misstating the "missed payment" dates, led the company to apply dividends to premium payments even when it was not necessary; by doing so Thone might have earned a little extra commission (about thirty cents), or he may have tried to save himself the bother of reminding policyholders to pay their premiums when due. In any event, his falsifications violated both company rules and his duty to the policyholders.

The parties also agree that relations between DiPirro and Thone were strained. In late 1979 and early 1980, there were acrimonious conversations involving the two of them. And, DiPirro, along with Topjian and Daniels, secured Thone's discharge. Within this broad framework, however, the parties strongly dispute what occurred.

The evidence regarding the § 8(a)(1) violation exemplifies the dispute, for there is a direct conflict in the testimony. Thone states that on one occasion DiPirro told him that if he did not withdraw a grievance DiPirro would "get [him] on one thing or another eventually." Leland Greenberg testified that on another occasion DiPirro told him that he, Greenberg, "should speak to [Thone] and tell [Thone] to knock off the bullshit that had been going on in the office in regard to familiarizing new agents with the procedures." If Thone did not "knock it off ... he'd be terminated." DiPirro simply denied making these statements. The ALJ believed Thone and Greenberg; he did not believe DiPirro.

If Thone and Greenberg are telling the truth, DiPirro and, hence, Boston Mutual, violated § 8(a)(1), for they coerced Thone in the exercise of his § 7 right to perform his duties as union steward. *NLRB v. East Texas Pulp & Paper Co.,* 346 F.2d 686, 687 (5th Cir.1965). The issue was solely one of credibility. And, in reviewing an agency's finding of credibility, we must accept the finding unless it exceeds "the bounds of reason." *P.S.C. Resources, Inc. v. NLRB,* 576 F.2d 380, 382 (1st Cir.1978). The company here argues for a stricter

standard of review on the ground that the ALJ based his credibility findings on reasons set out in the record rather than upon observation of demeanor. In fact, the ALJ bases his findings in part upon demeanor; he states, for example, that Leland Greenberg's demeanor was "impressive," and that DiPirro was confused or evasive. Regardless, we have read the record and conclude that the ALJ's credibility findings were well within the "bounds of reason." The issue is not close.

■ Once the ALJ's credibility findings are accepted, the Board's § 8(a)(3) conclusion is more than adequately supported. For one thing, DiPirro's statements are strong evidence that protected activity underlay the discharge. In addition, the Board found that Topjian said, with respect to Thone, "we have to get that bastard." Then, they fired him. The company responds that, regardless, it had sufficient legitimate grounds for dismissing Thone. But, the ALJ found that these grounds were a "pretext": they would not have led to Thone's dismissal in the absence of his protected conduct. The ALJ based this conclusion upon DiPirro's statements, upon DiPirro's behavior in preparing his case against Thone, upon Topjian's conversations, and upon the fact that, in the ALJ's view, Thone's offenses did not rise to the level that would have led the company to dismiss others. The ALJ's reasoning is set out in his detailed opinion, and that opinion has adequate record support.

We see no need to go further and simply list here the facts and reasoning already set out in the ALJ's opinion, for what is required in a "substantial evidence" case—at least where the ALJ's opinion is fairly comprehensive—is a reading by the appellate court of the opinion in light of the record so that there will be an independent determination of whether the ALJ has reached a reasonable conclusion. Detailed reiteration of the facts and reasoning does not seem to be a useful exercise.

■ We shall, however, mention two points. The company emphasizes that Daniels, who ultimately fired Thone, did not know about Thone's union activity. This fact, it believes, shows that the dismissal must have been motivated by legitimate considerations. We agree that it shows that the grounds given by the company, under company policy, *could* have constituted a sufficient basis for dismissal; but it does not show that those grounds *did* lead to dismissal in this instance. To the contrary, the ALJ found that DiPirro and Topjian (for whose actions the company is equally responsible) acted for "bad," not "good," reasons. And, Daniels acted in direct response to what they told him. Moreover, we are reluctant to adopt a rule that would permit the company to launder the "bad" motives of certain of its supervisors by forwarding a dispassionate report to a neutral superior. The ALJ found that ordinarily DiPirro dismissed agents on his own authority without bringing Daniels into the matter; hence, the fact that DiPirro and Topjian went to the trouble of involving Daniels suggested to the ALJ that DiPirro and Topjian were trying to create a cover for their "bad" motive. Such a view is not unreasonable. And, it supports the notion that without the "bad" motive, neither Daniels, nor anyone else, would have dismissed Thone.

Second, we believe that the ALJ used the proper standard for judging the § 8(a)(3) issue. For one thing, much of what the ALJ and the Board say suggests that they saw the case as a "pretext" case, *i.e.,* a case in which there is no mixture of "good" and "bad" motives because the "good" motive does not exist. If that is their view, then the ALJ necessarily made an independent judgment that the General Counsel had borne his overall burden of proving that Thone would not have been dismissed in the absence of the "bad" motive—a conclusion that, as we have said, is adequately supported in the record. Some of the ALJ's language suggests, however, that he may have analyzed the case in terms of "burdens of proof", *i.e.,* did the employer satisfy his "burden" of showing a "good motive that was sufficient in itself to cause the discharge." Nonetheless, if he did so, he ap-

plied the standard required by this court's *Wright Line* decision. *NLRB v. Wright Line, A Div. of Wright Line, Inc.,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). Although he decided the case just before that decision was issued, the ALJ noted that, after a *prima facie* case is established, the burden of proof shifts to the company. But, the ALJ, quoting *Wyman-Gordon v. NLRB,* 654 F.2d 134 (1st Cir.1981), explicitly noted that the shifting burden "does not impose an overall burden upon the company to prove itself innocent .... Rather, the company must come forward with evidence to the point where no longer does a preponderance of the evidence establish the violation." 654 F.2d at 142. In other words, the ALJ noted that he must make an independent determination at the close of both cases about whether a preponderance of the evidence still shows the existence of a "bad" motive that was a necessary cause for the dismissal. This was the point of *Wright Line.*

*Since the decision is adequately supported in the record, the petition for review is denied and the Board's order is enforced.*

### APPENDIX

§ 157.  *Right of employees as to organization, collective bargaining, etc.*

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

§ 158.  *Unfair labor practices*

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

.  .  .  .  .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ....