**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1340

BARDON, INC., d/b/a Aggregate Industries,

Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent,

INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP
BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, AFL-CIO, CLC,

Intervenor.

No. 22-1421

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP
BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, AFL-CIO, CLC,

Intervenor,

v.

BARDON, INC., d/b/a Aggregate Industries,

Respondent.

On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.  (05-CA-248026)

_____

Argued:  October 25, 2023                    Decided:  January 8, 2024

_____

Before DIAZ, Chief Judge, THACKER, Circuit Judge, and Julie R. RUBIN, United States District Judge for the District of Maryland, sitting by designation.

_____

Petition for review denied and cross-application for enforcement granted by unpublished per curiam opinion.

_____

**ARGUED:**  Terrence J. Miglio, BUTZEL LONG, PC, Ann Arbor, Michigan, for Petitioner/Cross-Respondent.  Brady John Francisco-FitzMaurice, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.  **ON BRIEF:** Barbara E. Buchanan, Joseph E. Richotte, Blake C. Padget, BUTZEL LONG, P.C., Troy, Michigan, for Petitioner/Cross-Respondent.  Usha Dheenan, Supervisory Attorney, Matheus Teixeira, Jennifer Abruzzo, General Counsel, Peter Sung Ohr, Deputy General Counsel, Ruth E. Burdick, Deputy Associate General Counsel, David Habenstreit, Assistant General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.  Brandon E. Wood, BLAKE & UHLIG, P.A., Kansas City, Kansas, for Intervenor.

_____

Unpublished opinions are not binding precedent in this circuit.

2

PER CURIAM:

Bardon, Inc., a division of Lafarge Holcim U.S., d/b/a Aggregate Industries ("Petitioner"), petitions for review of a decision and order of the National Labor Relations Board (the "Board") finding that Petitioner engaged in unfair labor practices, in violation of sections 8(a)(1) and (3) of the National Labor Relations Act ("NLRA"). The Board determined that Petitioner had coerced employees in the exercise of their right to engage in protected union activity and improperly terminated an employee in violation of sections 8(a)(1), (3) of the NLRA.

Petitioner contends that the Board's order is not supported by substantial evidence in the record, particularly where the anti-union statements at issue are too vague and inconsequential to amount to anti-union animus and the employee at issue was terminated as a result of a safety violation. Petitioner also avers that the Board exceeded its authority pursuant to section 10(c) of the NLRA when it ordered Petitioner to reinstate the wrongfully terminated employee. In turn, the Board asks this court to affirm its decision and order in full.

Because substantial evidence in the record supports the Board's decision and order, we deny the petition for review and grant enforcement of the Board's order.

I.

A.

1.

Petitioner operates approximately 225 facilities in the United States, including a quarry facility in Millville, West Virginia (the "Millville Facility") where it mines, crushes,

and sizes rock.  The Millville Facility covers several acres and includes 30 conveyor belts. These conveyor belts are up to 300 feet in length, and the machinery that drives them is powerful enough to create a risk of serious, potentially fatal, injury.  At the Millville Facility, Petitioner employs approximately 50 individuals, 37 of whom are hourly employees.

This appeal involves Petitioner's actions leading up and subsequent to a successful vote by the Millville Facility employees to be represented by the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL–CIO, CLC (the "Union").

Most pertinent to this case are the second shift Millville Facility employees, including Jose Molina ("Molina"), a maintenance mechanic who led the Union campaign. At the relevant time, Molina had been employed with Petitioner for 16 years.  Second shift employees Moris Alberto ("Alberto"), a maintenance mechanic who had worked for Petitioner for four years, and Thomas Johns ("Johns"), an 18-year-old truck driver who was newly employed by Petitioner, also supported the Union, but not openly.  The only supervisor on the second shift during the relevant time was Curtis Mills ("Mills"), who had held that position for 15 years.  His son, C.W. Mills ("C.W."), was the lead mechanic for the third shift.  The highest ranking official at the Millville Facility was plant manager Andrew Wright ("Wright"), who began working for Petitioner in February 2019.

## 2.

Prior to 2019, Petitioner's hourly employees had unsuccessfully attempted to unionize the Millville Facility on multiple occasions.  On June 5, 2019, the Union made

4

another attempt to represent the hourly employees at the Millville Facility. Molina led the Union campaign by distributing pro-union literature and union authorization cards to coworkers, collecting signed cards, and inviting coworkers to offsite Union meetings.

In response to the petition to unionize, Pat Lane ("Lane"), the director of labor relations for Lafarge Holcim U.S., met with Millville Facility managers and supervisors to strategize about Petitioner's response to the Union campaign. As a result, Petitioner began holding mandatory meetings for employees during each of the three work shifts to campaign against the Union. These mandatory meetings were led by plant manager Wright, regional operations manager James Bottom ("Bottom"), and regional human resources manager Terri Collins ("Collins").

Managers also held one-on-one meetings with employees to discuss the Union petition. For instance, Bottom met individually with Molina, Alberto, and Johns for between 15 minutes and 1.5 hours each. Molina testified that Bottom asked him "about what kind of problems we [were] having at work" and why the employees "wanted the Union in." J.A. 202.[1] Despite Bottom's promises to address Molina's concerns, Molina responded, "[E]very time . . . that a union tries to come in, [Petitioner] makes a bunch of promises, and nothing gets done." *Id.* Alberto testified that when Bottom met with him, Bottom asked him how he intended to vote in the Union campaign, but Alberto did not divulge his vote. Johns testified that while he was working the night before the Union election, Bottom entered the vehicle he was operating and accompanied Johns for up to 1.5

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

hours. During that time, Bottom asked Johns how he "felt about the Union" and whether he knew anybody in a union. J.A. 498–99. Johns also recounted that during this conversation, Bottom stated that the Union would take salary, vacation time, and retirement account funds from employees.

Wright also met separately with each of the hourly employees two or three times to campaign against the Union. During a meeting with Molina, Wright tried to persuade Molina there was no need for the Union if Molina would give him "a chance" to improve the Millville Facility. J.A. 83. Molina responded by complaining about Mills' conduct as a supervisor. Molina told plant manager Wright that Mills showed unfair favoritism and required employees to perform tasks in an unsafe manner. After this conversation, and prior to the Union representation election, Wright told Mills about Molina's criticism of him. During the Union campaign, Molina also expressed his complaints about Mills to human resources manager Collins.

Prior to the Union election, Mills told Molina, Alberto, and third shift employee Timothy Rutherford ("Rutherford") that he knew that Molina and the second shift employees were the "troublemaker[s]" "carrying the train" for the Union. J.A. 597, 599. And in the week before the Union election, Mills told the employees that "he only had to be nice [to them] for one more week." J.A. 385.

### 3.

On June 27, 2019, the Millville Facility held the Union representation election. The employees voted in favor of Union representation and, by the end of that day, Mills, Wright, and Lane were aware of the result.

6

The following day, June 28, Molina and Alberto were the maintenance mechanics working on the second shift. Johns was also on duty. Mills instructed Molina and Alberto to repair a conveyor belt that had gotten off track. With 20 years of experience between them, both Molina and Alberto were well accustomed to repairing belts at the Millville Facility. Per industry standards, if it is not possible to align the belt with "less involved approaches" such as "tapping the rollers along the length of the belt" or "turning the adjustment bolt . . . that drives the belt," the mechanics must "remove [the] metal safety guards that screen the tail pulley assembly" in order to make the repair. J.A. 1701. These safety guards "create a cage around the mechanism" that prevents employees from placing their hands within the area where the moving parts can cause serious or fatal injury. *Id.*

When Molina and Alberto attempted to track the belt, their less invasive approaches were unsuccessful, so Molina informed Mills that the repair would take longer than expected and would require the employees to "get in the tail section." *Id.* Although his shift had not started, C.W. approached the repair area where Molina and Alberto (as well as Johns who had come to offer assistance) were working. C.W. observed that the employees had removed the safety guards without "lock[ing] out" the belt. *Id.*

Locking out (or LOTOTO) is part of Petitioner's corporate-wide health and safety management policy. After turning off the power supply to the equipment being repaired, locking out requires an employee to: (1) lock out the power supply by placing a lock on the appropriate breaker in the breaker room to secure it in the "off" position; (2) tag out the lock by placing a tag on the lock that lists the employee's name; and (3) try out the equipment to confirm it is de-energized by asking the plant operator to try running the

7

equipment. The policy identifies violations of Petitioner's lockout protocol as being among the more serious of two categories of misconduct and states that such a violation can "result in immediate disciplinary action up to, and including, separation of employment." J.A. 1305.

Upon observing the lack of lockout procedure by Molina, Alberto, and Johns, C.W. called Mills to report that the three employees were working on the belt without locking it out. But instead of going straight to the repair area to address the situation, Mills went to the breaker room some distance away and took a photograph showing that the breaker for the conveyor belt was not locked out. Mills took the photograph at 9:04pm. Mills then drove to the area where the work was being performed, and at 9:08pm, Mills photographed the employees working on the belt without locking it out. After being approached by Mills, Molina and Alberto locked out the belt. Mills discussed the matter with C.W., who then contacted Wright by text message to inform him about the incident. Wright responded that Mills should "handle" it. J.A. 1702. Mills subsequently texted Wright and provided him with the photographs he had taken. Wright told Mills to "document everything." *Id.* That day or the following day, Wright contacted his superior, regional operations manager Bottom, to discuss the lockout violation.

4.

The following morning, June 29—two days after the Union representation vote— Petitioner suspended Molina, Johns, Mills, and C.W., pending investigation into the

8

lockout violation.[2]  Petitioner assembled a local team to investigate the June 28 alleged lockout violation.  The investigation team included Wright, Collins, and Jeffrey Harmon ("Harmon") (regional manager for health and safety).  The local investigation team reported to a corporate review team ("CRT") made up of Lane, Collins, and three other corporate officials (the director of safety for Lafarge Holcim U.S., the general manager for Petitioner's mid-Atlantic region, and Petitioner's in-house legal counsel).

After conducting two rounds of interviews, the local investigation team recommended to the CRT that Molina, Alberto, and Johns all be terminated.  The CRT agreed with that recommendation.  Collins came to the Millville Facility on July 12 and notified Molina, Alberto, and Johns that they were terminated effective immediately.  All three termination letters included the following language:

> The Company has taken this action because you violated the Company Safety Standards for Machine Guarding and Lock Out – Tag Out – Try Out (LOTOTO) when you removed guards from the M25 Conveyor Belt and were attempting to perform repairs without first locking out the equipment properly; thus placing you and others at risk for serious injury or death.

J.A. 1703.  Johns' termination letter also explained that Johns' termination was additionally based on the conclusion that Johns "provided false information during an investigation into

---

[2] Petitioner did not initially suspend Alberto.  But when Alberto's role in the repair later came to light, he was also suspended pending the investigation.

the matter, which violates both our incident reporting protocols and our major work rules for honesty."[3]  *Id.*

## B.

Acting on an unfair labor practice charge filed by the Union, the Board's General Counsel filed a complaint (the "Complaint") alleging that Petitioner violated sections 8(a)(1) and (3) of the NLRA by threatening and interrogating employees, creating the impression that employees' Union activities were under surveillance, and discharging Molina in order to discourage Union membership.[4]  An employer violates section 8(a)(1) of the NLRA if "under all of the circumstances, the employer's conduct . . . reasonably tend[s] to coerce or intimidate employees" in the exercise of their protected rights.  *NLRB v. Grand Canyon Mining Co.*, 116 F.3d 1039, 1044 (4th Cir. 1997).  "Section 8(a)(3) makes it an unfair labor practice for an employer to discriminate 'in regard to hire or tenure of employment to encourage or discourage membership in any labor organization.'"  *Salem Leasing Corp. v. NLRB*, 774 F.2d 85, 87 (4th Cir. 1985) (per curiam) (quoting 29 U.S.C. § 158(a)(3)).

---

[3] After hearing his testimony, the ALJ determined that Johns had, during an interview with the local investigation team, falsely stated that he had not helped with the June 28 repair.  In a later interview, and again under oath during trial, Johns admitted that he initially made false statements to Petitioner regarding his role in the repair.

[4] Although the Complaint also alleged that Petitioner discharged Alberto and Johns in violation of NLRA section 8(a)(3), those allegations have been resolved by a partial settlement agreement and are not at issue in this appeal.

In January 2021, the parties appeared before the ALJ for an evidentiary hearing on the merits. C.W. was called by Petitioner as a witness. Prior to the hearing, C.W. twice met with Lane and Petitioner's trial attorneys to prepare C.W.'s testimony. During the initial meeting, C.W. was asked about "sides" of the Union campaign, "[l]ike who they thought like was Union sides or like Company sides or . . . who associate [sic] with who." J.A. 779–80. During the second meeting, he was asked, "just pretty much like who I thought was [on] what side." J.A. 782–83. At trial, C.W. testified that he did not recall Petitioner's attorneys telling him he was not required to participate in the meetings or reassuring him that Petitioner would not retaliate against him if he decided not to participate. As a result, the Board's General Counsel amended the Complaint to allege that, in preparation for trial, Petitioner improperly interrogated employees about Union memberships, activities, and sympathies.

Following the evidentiary hearing, the ALJ held that Petitioner violated sections 8(a)(1) and (3) of the NLRA. The ALJ determined that Petitioner violated section 8(a)(1) when Mills told the second shift employees the "office" knew they were the "troublemaker[s]" behind the Union campaign and that Mills "only had to be nice [to them] for one more week." J.A. 1710–12. The ALJ found the testimonies of Molina, Alberto, and Rutherford credible as their recollection of Mills' statements was "clear, certain, and generally corroborative of one another." J.A. 1698 Specifically, the ALJ found that despite the employees' stake in the litigation, their testimony regarding Mills' menacing statements about the Union petition and election were more compelling than Mills' "exaggerated" and

11

inconsistent denials of the same. *Id.* The ALJ concluded Mills' statements amounted to anti-union animus.

The ALJ also held that Petitioner violated section 8(a)(1) by improperly interrogating employees about Union affiliations on at least two occasions. First, the ALJ concluded that Bottom's one-on-one meeting with Johns in his truck during his work shift prior to the Union election constituted a coercive interrogation considering the difference in authority between Bottom, as regional manager, and Johns, a new hourly employee who was only 18 years old and working his first job at the time of the interview. The ALJ noted additional support for the coerciveness of the interview, including: (1) the fact that Johns could not leave the conversation as Bottom had conducted the interview while riding in the vehicle Johns was operating at work; (2) the length of the interview, which lasted as long as 1.5 hours; and (3) that Bottom failed to provide Johns any assurance that the questions were benign and he would not be retaliated against by Petitioner. And the ALJ held that Petitioner violated section 8(a)(1) when it questioned C.W. about the "Union sides" at the Millville Facility. J.A. 1709.

Regarding Molina's lockout violation, the ALJ held that Petitioner violated section 8(a)(3) by terminating Molina because he engaged in pro-Union activities. The ALJ found prima facie evidence that Molina's termination was motivated by anti-union animus. The ALJ pointed out that the timing of Molina's termination, which began with his suspension two days after the Union vote, provided strong evidence of animus. The ALJ also relied on Mills' statements that the second shift employees were the "troublemaker[s]" behind the Union campaign and that he only had to be nice for one more

12

week solidified that Molina's termination, which began with Mills' report of the lockout violation, violated the NLRA.

The ALJ then found that Petitioner failed to show that absent any anti-union animus, it would have terminated Molina anyway. The ALJ reasoned that Petitioner subjected Molina to disparate treatment by using its lockout policy as grounds for his termination when it had not previously terminated any employee at the Millville Facility for a lockout violation. Based on the evidence, the ALJ concluded, "prior to the Molina incident, [Petitioner] did not discipline employees at the Millville [F]acility for failing to lock out equipment before removing guards" despite the official lockout policy. J.A. 1705. In contrast, the record revealed that prior to the Union election supervisors actually encouraged employees to skip lockout protocols because they were under pressure to increase production.

The ALJ found that James Osborne ("Osborne"), a plant operator, credibly testified that before Molina's firing, "if a supervisor caught you with no lock on, he'd just tell you to go put a lock on and it was over with. That's between you and the supervisor. . . . [T]here wasn't nothing done about it." J.A. 417–18. As a plant operator, Osborne was one of the employees who would try out the machines after they were locked out to make sure they were de-energized. Osborne testified that historically locking out was not a "zero-tolerance" policy at the Millville Facility. J.A. 418. In further support of Petitioner's lack of enforcement of its lockout policy, Osborne testified that another violation occurred three weeks after Molina's incident, but when Osborne reported this incident to C.W., C.W. was "unconcerned." J.A. 1707. In that instance, it took Osborne reporting the violation to a

13

supervisor for the LOTOTO policy to be enforced. Based on this evidence, the ALJ held that Petitioner fired Molina because of his Union activities.

Petitioner appealed the ALJ's findings to the Board. The Board adopted the findings and concluded that Petitioner violated section 8(a)(1) of the NLRA by intimidating the second shift employees prior to the Union representation vote by making threats of retaliation and holding coercive interrogations. The Board further found that Petitioner violated section 8(a)(3) by terminating Molina for concerted activity and rejected Petitioner's defense that it would have fired Molina anyway because he violated lockout.

Regarding Molina's termination specifically, the Board concluded that the General Counsel proved Molina was engaged in protected Union activity and that Petitioner's decision to terminate him was motivated by anti-union animus. The Board accepted the ALJ's findings that the following facts supported a finding of anti-union animus: Mills' threatening statements prior to the Union election, Molina's firing coming close in time following the successful Union election, and the enforcement of the LOTOTO policy against Molina when it had not previously been grounds for termination at the Millville Facility. The Board further held that Petitioner failed to meet its burden to prove that it would have discharged Molina regardless of his Union activities. Based on these violations, the Board ordered that Petitioner reinstate Molina and provide backpay for any loss of earnings and other benefits.

Petitioner petitioned this court for review of the Board's decision and order. And the Board cross-petitioned for full enforcement of its order.

14

II.

Our review of the Board's order "is limited, as we must uphold the [Board's] findings of facts if they are supported by substantial evidence, considering the record as a whole." *Tecnocap, LLC v. NLRB*, 1 F.4th 304, 312 (4th Cir. 2021) (internal quotation marks omitted). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Grand Canyon Mining*, 116 F.3d at 1044. It is "more than a scintilla of evidence, but less than a preponderance." *Sinai Hosp. of Balt., Inc. v. NLRB*, 33 F.4th 715, 722 (4th Cir. 2022). "Under this standard, we can't displace the [Board's] choice between two fairly conflicting views of the evidence." *S.C. State Ports Auth. v. NLRB*, 75 F.4th 368, 378 (4th Cir. 2023).

We will also uphold the Board's legal interpretations of the NLRA if they are "rational and consistent with the Act," even if the Board's reading is not "the best way to read the statute." *Id.*

"Reviewing courts owe deference to factual findings, assessing them only to determine whether they are supported by substantial evidence." *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). "In conducting our review, we consider the entire record before us, including the ALJ's recommendation" and any contrary evidence. *Blackburn v. Martin*, 982 F.2d 125, 128 (4th Cir. 1992) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 477, 488 (1951)). When factual findings "rest upon credibility determinations," we accept them absent "exceptional circumstances." *Eldeco*, 132 F.3d at 1011 ("Exceptional circumstances include cases where a credibility determination is unreasonable, contradicts

15

other findings of fact, or is based on an inadequate reason or no reason at all." (internal quotation marks omitted)).

III.

A.

The Board held that Petitioner violated section 8(a)(1) of the NLRA on four grounds: (1) threatening reprisal for protected activity; (2) creating a coercive impression of surveillance; (3) interrogating employees regarding their Union support; and (4) improperly questioning C.W. during trial preparation. We address each violation in turn.

1.

Petitioner argues Mills' statements leading up to the Union representation vote were too vague and ambiguous to amount to a violation of section 8(a)(1), but we conclude the Board properly held that Mills made threats of reprisal.

An employer violates § 8(a)(1) by threatening reprisals against employees for exercising rights guaranteed under section 157 of the NLRA. *Equitable Gas Co. v. NLRB*, 966 F.2d 861, 866 (4th Cir. 1992). This test is objective—"It makes no difference whether the language or acts were coercive in actual fact," nor "does it matter whether the employer acted with anti-union animus." *Consol. Diesel Co. v NLRB*, 263 F.3d 345, 352 (4th Cir. 2001) (internal quotation marks omitted). "Rather, the salient inquiry is whether the conduct may reasonably tend to coerce or intimidate employees." *Alton H. Piester, LLC v. NLRB*, 591 F.3d 332, 336 (4th Cir. 2010) (internal quotation marks omitted). Because "[d]eterminations concerning tendency to coerce are essentially for the specialized

16

experience of the Board," we "grant considerable deference to the Board's decisions on such matters." *Id.* (internal quotation marks omitted).

Substantial evidence supports the conclusion that Petitioner's employees would have reasonably understood Mills' statements that they were "troublemaker[s]" and he "only had [to] be nice for one more week" as threats of unspecified reprisal. J.A. 1712. When considering the parties' conflicting perspectives of Mills' comments, the ALJ reasoned that these statements, "standing alone, communicate[] that the employer considers them undesirable employees because they exercised their statutorily protected rights." *Id.* (citing *Corliss Resources, Inc.*, 362 NLRB 195, 195–96 (2015) (concluding that "backstabbers" statement amounted to threat of reprisal)). We agree.

Mills' statement that he "only had [to] be nice for one more week" implied future retribution against the employees. J.A. 1712. When examining the evidence, the ALJ emphasized, "A reasonable employee would see this remark as a threat especially since, immediately after the election, Curtis Mills instigated the investigation that led to 'troublemaker' Molina being terminated after 16 years of virtually unblemished performance as an employee." *Id.* Again, we agree.[5]

---

[5] Petitioner argues that Rutherford's testimony that Mills called Molina a troublemaker in the fall of 2018 does not support the complaint's accusation that this occurred in "[a]bout June 2019," J.A. 1224. Petitioner mischaracterizes Rutherford's testimony. Rutherford testified that "[i]t may have been both," and said in his affidavit that the statements occurred "[o]ver the months from 2018 leading up to the election." J.A. 358. Petitioner does not point to any authority to show why such testimony does not fit into the complaint's accusation.

17

Additionally, Petitioner challenges the ALJ's conclusion that the employees' accounts of the events leading up to the Union vote were more credible than those of Mills and Bottom.  The ALJ is uniquely situated to make credibility determinations, *Eldeco*, 132 F.3d at 1011, and the ALJ's determination in this regard is accorded substantial deference, absent exceptional circumstances.  *Sam's Club v. NLRB*, 173 F.3d 233, 240 (4th Cir. 1999) ("Exceptional circumstances include those instances when a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." (internal quotation marks omitted)).  The ALJ closely considered each witness's testimony and detailed why the employees were more credible than Petitioner's witnesses.  For instance, the employees generally corroborated each other's testimony of Mills' anti-union statements.  Moreover, the ALJ did not blindly accept the employees' testimony but instead disregarded their testimony where it was vague or inconsistent with the record.  And to the extent that Petitioner points to inconsistencies in the record to undermine the ALJ's credibility findings, it fails to make out exceptional circumstances warranting reversal.  Thus, the ALJ's credibility findings are reasonable based on the record before us.

### 2.

The Board's conclusion that Petitioner violated section 8(a)(1) by creating a coercive impression of surveillance is likewise supported by substantial evidence.

An "employer's observation of union activities can be reasonably construed as excessive or coercive surveillance [where] it unreasonably chill[s] the exercise of the[] employees' Section 7 rights." *Intertape Polymer Corp. v. NLRB*, 801 F.3d 224, 235 (4th

18

Cir. 2015) (quoting *NLRB v. Southern Md. Hosp. Ctr.*, 916 F.2d 932, 938 (4th Cir. 1990) (per curiam)).  The question is whether the statements have a reasonable tendency to intimidate. *Id.*

Here, Mills created the impression that employees' Union activities were being monitored when he told them that the "office" knew the second shift employees were the "troublemaker[s]" behind the Union campaign.  J.A. 1698.  It would be reasonable for the second shift employees to conclude that their Union activities had been under surveillance "since they were holding their union meetings off-site and a number of the [second] shift employees to whom the remarks were made had been circumspect about revealing their views."  J.A. 1711.

3.

The Board also appropriately held that Petitioner improperly interrogated employees about their Union affiliations prior to the successful Union election.  But Petitioner argues that the ALJ improperly applied a subjective standard, which was in turn adopted by the Board, when analyzing whether Petitioner's interrogation of employees regarding their Union support violated section 8(a)(1).

"Interrogation violates § 8(a)(1) only if it tends to coerce." *Standard-Coosa-Thatcher Carpet Yarn, Inc. v. NLRB*, 691 F.2d 1133, 1139 (4th Cir. 1982).  In determining the coerciveness of questioning or interrogation of employees about their Union sentiments, we consider the totality of the circumstances, "including the history of employer hostility to the union, the nature of information sought, the identity of the questioner, and the place and method of questioning." *Intertape Polymer*, 801 F.3d at 231

19

(internal quotation marks omitted).  We also consider whether the questioner "explained the purpose of [the] question" or provided "any assurances against retaliation," and "whether the employee was reluctant to discuss unionization." *Id.* (citations omitted).  The standard is objective, *see PPG Indus., Inc.*, 351 NLRB 1049, 1053 (2007).  With respect to Bottom's interview of Johns, Johns was a new, young hourly employee being questioned by Bottom, a regional level official.  Johns testified that while he was operating a loader vehicle the night before the election, Bottom entered the vehicle and accompanied Johns for up to 1.5 hours.  Johns testified that Bottom asked him how he "felt about the Union." J.A. 1699.  The ALJ, and therefore the Board, did not err by considering whether an employee of Johns' level would feel coerced by a high-level official like Bottom in this circumstance.  *Stoody Co.*, 320 NLRB 18, 18 (1995) ("The questioning of an employee about his union sentiments by a high level supervisor in his office immediately after a confrontation which led to discipline, with no proper reason or assurances given concerning the questioning, reasonably tends to restrain, coerce, or interfere with statutory rights.").

Further, in weighing Bottom's testimony against that of the employees, the ALJ detailed why Bottom's version strained credibility.  The ALJ noted, "[W]hile [Bottom denied] that he asked employees how they were going to vote, [he] also stated that 75 percent of the employees he talked to . . . volunteered that they would vote against unionizing." J.A. 1699.  The ALJ found it "improbable . . . that so high a percentage of employees would reveal their voting intentions to Bottom without even being asked." *Id.* In fact, "attempts to conceal union support weigh *in favor* of finding an interrogation

20

unlawful." *Camaco Lorain Mfg. Plant*, 356 NLRB 1182, 1182 (2011). Further, there was no corroboration of Bottom's account of the interviews.

Again, on review, the ALJ's credibility determinations are reasonable, and there are no "extraordinary circumstances" that support disturbing them. *Eldeco*, 132 F.3d at 1011.

4.

Finally, Petitioner argues that the Board lacked substantial evidence to find that Petitioner improperly interrogated C.W. during trial preparation. Again, the record supports the Board's finding that Petitioner failed to provide the requisite safeguards while interviewing employees in preparation for trial, in violation of NLRA section 8(a)(1).

Especially in the pretrial context, "a significant risk of coerciveness arises when an employer questions employees about a union without informing them that they may, with impunity, decline to respond." *Standard-Coosa-Thatcher Carpet Yarn*, 691 F.2d at 1141. To mitigate this risk, the Board has "established specific safeguards designed to minimize the coercive impact of such employer interrogation." *Johnnie's Poultry Co.*, 146 NLRB 770, 775 (1964), *enf't denied*, 344 F.2d 617 (8th Cir. 1965). The employer:

> must communicate to the employee the purpose of the questioning, assure him that no reprisal will take place, and obtain his participation on a voluntary basis; the questioning must occur in a context free from employer hostility to union organization and must not be itself coercive in nature; and the questions must not exceed the necessities of the legitimate purpose by prying into other union matters, eliciting information concerning an employee's subjective state of mind, or otherwise interfering with the statutory rights of employees.

*Id.* "Compliance with the *Johnnie's Poultry* safeguards is the minimum required to dispel the potential for coercion . . . ." *Standard-Coosa-Thatcher Carpet Yarn*, 691 F.2d at 1141 (internal quotation marks omitted).

The record supports that Petitioner exceeded "the necessities of the legitimate purpose" of its interview of C.W. "by prying into other union matters" in violation of section 8(a)(1). *Johnnie's Poultry*, 146 NLRB at 775. Specifically, during trial, when asked whether Petitioner's counsel asked C.W. "anything about what other employees might have been involved in the Union campaign," J.A. 779, C.W. testified that he was asked, among other questions, "who [the employees] thought . . . was Union sides or like Company sides . . . who associated with who I guess." J.A. 774. After hearing the parties' evidence and testimony, the ALJ determined that the record was vague and underdeveloped as to whether Petitioner provided C.W. any of the required assurances at the time it questioned him.

Petitioner argues that an understanding of the general Union support of employees at the Millville Facility was relevant for trial preparation because the Complaint was not limited to only the three LOTOTO violating employees. And Petitioner argues that at minimum, knowledge of the Union affiliations of the terminated employees was relevant because whether its supervisors knew of the employees' Union activity at the time of the discrimination (for instance, when Molina was terminated) can support or negate a finding that Petitioner acted with anti-union animus. In other words, if no relevant supervisor knew of the protected activity, then Petitioner could argue it could not have acted with animus.

22

Nevertheless, the Board agreed with the ALJ that Petitioner's counsel exceeded the necessities of questioning by prying into the Union sympathy of employees other than the three employees who had been terminated. We do as well. Even if we were to accept that counsel intended to question C.W. about only the three terminated employees, the record supports that Petitioner crossed the line by asking C.W. questions about Union support and affiliation in general. These questions were not relevant to trial, especially where employees were reluctant to disclose their Union sympathies.

## B.

### 1.

We now turn to the Board's holding that Petitioner violated section 8(a)(3) of the NLRA. Petitioner contends that the Board incorrectly held that the General Counsel proved a prima facie case of discriminatory discharge in violation of section 8(a)(3). Petitioner reasons that the Board improperly imputed a supervisor's anti-union animus to the CRT, the neutral decisionmaker, and without this animus, Petitioner argues no prima facie showing was made.

Section 8(a)(3) prohibits an employer from discriminating "in regard to hire or tenure" to discourage membership in a labor organization. 29 U.S.C. § 158(a)(3). To succeed on an unlawful termination claim, the General Counsel must prove "(1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, and (3) that the activity was a substantial or motivating reason for the employer's decision." *FPC Holdings, Inc. v. NLRB*, 64 F.3d 935, 942 (4th Cir. 1995). On appeal,

23

Petitioner challenges the Board's finding on prong three—that Petitioner's decision to terminate Molina was motivated by anti-union animus.

To address whether an employer acted with a discriminatory motive, we apply what is commonly referred to as the *Wright Line* test. *Id.* (citing *Wright Line*, 251 NLRB 1083 (1980)). "The *Wright Line* test was designed to account for the fact that employers rarely admit that they took adverse action against employees with the unlawful intent to discriminate." *NLRB v. Air Contact Transp. Inc.*, 403 F.3d 206, 215 (4th Cir. 2005). To begin, "the NLRB General Counsel must prove by a preponderance of the evidence that anti-union animus was a substantial or motivating factor in the discharge." *Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831, 839 (4th Cir. 2000). Once established, "[t]he burden then shifts to the employer to prove affirmatively that the same action would have been taken even in the absence of the employee's union activity." *NLRB v. CWI of Md., Inc.*, 127 F.3d 319, 330 (4th Cir. 1997).

Regarding findings of animus, this court will "not engage in a de novo consideration of the record, but instead defer to the Board's conclusion that particular conduct demonstrates antiunion animus unless the Board exercises the power conferred on it in an arbitrary and unreasonable manner." *Tecnocap*, 1 F.4th at 324 (internal quotation marks omitted). Both direct and circumstantial evidence can support a finding of anti-union animus. *FPC Holdings*, 64 F.3d at 942.

## 2.

Here, substantial evidence in the record supports the Board's finding of anti-union animus. First, we agree with the Board's conclusion that the timing of Molina's

termination provides powerful evidence in support of anti-union animus. *NLRB v. Frigid Storage, Inc.*, 934 F.2d 506, 510 (4th Cir. 1991) (upholding anti-union animus based on "the bare timing of [the employee's] discharge"). Molina led the employees' efforts to unionize. And Petitioner knew it. Molina distributed union authorization cards and literature, collected many of the signed cards, and served as one of two designated Union election observers—a fact that Molina shared directly with Mills, Wright, and Lane. Prior to the Union campaign, Molina had a nearly spotless disciplinary record at the Millville Facility. For his entire 16 year career, Molina had received only one infraction, and it was unrelated to safety or performance. And yet, two days after Molina led a successful Union vote, Petitioner suspended and ultimately terminated him due to an alleged safety infraction.

Mills' statements in violation of section 8(a)(1) also amount to substantial evidence of anti-union animus. The Board properly found evidence of anti-union hostility in Mills' statements made one week before the election that "the office" knew Molina was the "troublemaker" behind the Union campaign, and that Mills "only had to be nice for one more week." J.A. 1891–92.

3.

Petitioner argues that the Board erred when it imputed Mills' anti-union animus onto the CRT as the neutral decisionmaker that terminated Molina. This argument fails inasmuch as Mills' efforts to report the employees for the LOTOTO violation, right after the successful Union vote, was the impetus for the CRT proceedings that led to Molina's termination. And substantial evidence supports that, prior to the incident with Molina in

25

which Petitioner used the LOTOTO violation as grounds for termination, Petitioner had not disciplined employees at the Millville Facility for failing to lock out equipment before removing the guards. *Babcock & Wilcox Co. v. NLRB*, 683 F.2d 858, 859–60 (4th Cir. 1982) ("Disparity of treatment may be evidence that a company intentionally discriminated against an employee because of his union views.").

Anti-union animus can be imputed to a neutral decisionmaker where a supervisor, having exhibited anti-union animus, "significantly contributed to the accomplishment of the discharge." *NLRB v. Neuhoff Bros. Packers, Inc.*, 375 F.2d 372, 374 (5th Cir. 1967) (concluding employer acted with anti-union animus where the neutral decisionmaker's discharge decision was made immediately after a supervisor who had previously threatened to fire anyone who signed a Union card recommended termination, and then that supervisor informed the employee of the discharge). Anti-union animus can also be imputed where "the person effecting the discharge was shown to have had an adequate awareness of [the employee's] union loyalties and activities." *Id.* at 374–75. That is precisely what happened here.

First, not only were members of the CRT familiar with Molina's Union support, they were intimately involved in Petitioner's campaign against the Union. The CRT consisted of Lane and Collins, as well as Petitioner's legal counsel, the manager for its mid-Atlantic region, and its health and safety director. Prior to the investigation, after learning of possible support for unionization at the Millville Facility, Lane and Collins along with Wright met with the Millville Facility employees to urge them to vote against the Union. During those meetings, Molina was "the only employee who stated that he

26

would vote in favor of the Union." J.A. 1699 n.6. Molina also expressed his concerns about Mills' conduct as a supervisor to both Wright and Collins. And on the eve of the election, Molina told Lane and Wright separately that he would serve as the Union's election observer for the vote. Wright and Collins later assisted with the local investigation and recommended to the CRT that Molina be terminated.

Wright, Collins, and Lane's knowledge of Molina's Union activity distinguishes these facts from those cases where we have declined to impute knowledge to the decisionmaker. *See Gestamp S.C., LLC v. NLRB*, 769 F.3d 254, 263 (4th Cir. 2014) (reversing assignment of knowledge where ALJ did not and could not "have made such a finding on the record before him"); *Firestone Tire & Rubber Co. v. NLRB*, 539 F.2d 1335, 1337–39 (4th Cir. 1976) (reversing Board animus finding where company official who made the decision to discharge had zero knowledge that employee was involved in union); *Delchamps, Inc. v. NLRB*, 585 F.2d 91, 95 (5th Cir. 1978) (reversing Board animus finding where the supervisor solely responsible for termination had no knowledge of protected activity). It does not spare Petitioner that the CRT did not know that prior to Molina's termination lockout violations were going unpunished at the Millville Facility. It is enough to impute anti-union animus onto the CRT where Mills, who the Board found exhibited anti-union animus, significantly contributed to the accomplishment of Molina's discharge.

Because substantial evidence supports anti-union animus and the Board did not act arbitrarily when it imputed that animus onto the CRT, we affirm the Board's holding that Petitioner's decision to terminate Molina was motivated by anti-union animus.

27

4.

We turn next to whether Petitioner established its affirmative defense that, absent any protected activity, Petitioner would have taken the same adverse action against Molina. The Board rejected this defense, which Petitioner argues was in error.

Petitioner argues that it would have terminated Molina absent his protected activity. Petitioner points to the fact that the CRT has "terminated every employee known to have committed a LOTOTO violation corporate-wide for the previous 8 years—all 37 of them." Pet'r Opening Br. at 50. Petitioner further avers that the CRT lacked any knowledge that prior to the termination of Molina LOTOTO violations at the Millville Facility had not been reported or punished. This argument fails where, prior to the Union vote, Mills had not reported a single Millville Facility employee to the CRT for a LOTOTO violation. Once Molina led the successful Union campaign, Mills—who had exhibited anti-union animus—capitalized on the first opportunity to report Molina for a safety violation. Under these circumstances, the Board appropriately imputed Mills' animus onto the CRT where, absent Molina's Union support, Mills would not have reported the LOTOTO violation that led to Molina's termination.

As stated in *Boston Mutual Life Insurance, Co. v. NLRB*, simply because "the grounds given by the company, under company policy, *could* have constituted a sufficient basis for dismissal . . . does not show that those grounds *did* lead to dismissal in this instance." 692 F.2d 169, 171 (1st Cir. 1982) (emphasis in original). The question more appropriately is: would the stated grounds "have led to [the employee's] dismissal in the

28

absence of his protected conduct"? *Id.* Here, based on the evidence presented to the ALJ, the answer is no.

Substantial evidence supports the Board's conclusion that Mills would not have reported Molina for the LOTOTO violation absent Molina's Union support. Despite Petitioner's formal policy, Petitioner's actual practice at the Millville Facility was to tolerate LOTOTO violations. Indeed, Petitioner could not "establish a single instance, when, prior to discharging Molina, [Petitioner] had *ever* disciplined a Millville employee in *any* way for violating lockout procedures." J.A. 1706 (emphasis in original). And there is evidence that even when lockout violation reports were made, the Millville Facility supervisors did not take any disciplinary action. Osborne testified that just three weeks after the Molina incident, Osborne reported another LOTOTO incident to C.W., but in this instance, C.W. was unconcerned about the violation. *See* J.A. 410–11. In fact, it was not until Osborne went over C.W.'s head to a supervisor that there was punishment for this lockout violation. When considering Osborne's testimony, the ALJ concluded that had Osborne not escalated the most recent violation after Molina's to a supervisor, "the contractor's lockout violation would have gone unpunished." *Id.* Petitioner fails to show that absent Molina's Union affiliation, he would have been reported to the CRT for a LOTOTO violation. Without Mills' report, Molina would not have been terminated for his alleged safety violation when the record shows that this policy had never before been grounds for termination at the Millville Facility.

29

For these reasons, we affirm the Board's holding that Petitioner's reason for terminating Molina was pretextual.  Therefore, the Board properly held that Petitioner violated NLRA section 8(a)(3) when it terminated Molina based on his Union support.

## C.

Petitioner argues that even if the Board properly found that it violated NLRA section 8(a)(3) by terminating Molina, the Board exceeded its authority when it ordered Petitioner to offer Molina reinstatement and backpay.  But the law is clear, and it is to the contrary.

Once an unfair labor practice has been found, section 10(c) of the NLRA grants the Board the authority to issue an order requiring the violator to "cease and desist from such unfair labor practice, and to take . . . affirmative action including reinstatement of employees with or without backpay." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 898 (1984) (quoting 29 U.S.C. § 160(c)).  The Supreme Court has read section 10(c) to "vest[] in the Board the primary responsibility and broad discretion to devise remedies that effectuate the policies of the [NLRA], subject only to limited judicial review." *Id.* at 898–99.  "The Board's chosen remedy in a backpay case must be enforced unless it is arbitrary, capricious, or manifestly contrary to the statute." *NLRB v. Pepsi Cola Bottling Co. of Fayettville, Inc.*, 258 F.3d 305, 310 (4th Cir. 2001) (internal quotation marks omitted).  We are nevertheless "obligated to scrutinize the whole record, taking into account whatever fairly detracts from the evidence relied upon by the [Board]." *Id.* (internal quotation marks omitted).

30

Section 10(c) only precludes the Board from ordering reinstatement and backpay as remedies where an employer can prove that its actions would have been the same "regardless of [its] forbidden motivation." *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401 (1983), *abrogated on other grounds by Director, Off. of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994). There is no indication "that [section 10(c)] was designed to curtail the Board's power in fashioning remedies when the loss of employment stems directly from an unfair labor practice." *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 217 (1964).

For the same reasons discussed above in the analysis of Petitioner's affirmative defense, Petitioner cannot claim it would have removed Molina absent its "forbidden motivation." *Transp. Mgmt.*, 462 U.S. at 401. The causal link between Molina and his termination was his protected activity and not his LOTOTO violation as demonstrated by the timing of his discharge in relation to the Union election, the disparate enforcement of the lockout policy against Molina, and the anti-union statements made by Mills. Therefore, section 10(c) does not bar reinstatement or backpay. *Cooper Tire & Rubber Co. v. NLRB*, 866 F.3d 885, 893 (8th Cir. 2017) ("Since [employee] was discharged for a 'prohibited reason,' [employer] did not fire [employee] 'for cause' under Section 10(c).").

IV.

For the foregoing reasons, we deny the petition for review and grant the Board's cross-application for enforcement of its order in its entirety.

*PETITION FOR REVIEW DENIED;*
*CROSS-APPLICATION FOR ENFORCEMENT GRANTED*

31